Okay, our last case today. Number 22-13338, VSF Leasing Company versus Markel American Insurance Company. Mr. Cooper, whenever you're ready, take your time. May it please the court, my name is Ben Cooper. I represent Markel American Insurance. As a matter of the ECC's plain language and sound policy, banks are game changers. When they err in accepting a check, they are on the hook for the check, but the drawer is discharged. We're sorry that because of TDL, the insurance wrongdoing, and the bank's wrongdoing, VFS didn't receive what it believes it should have. But Markel American did pay and doesn't have to pay twice. The question is whom VFS should have sued, whether it's the bank or its co-payee, rather than Markel American, which did nothing wrong and, as the district court found, had no control. This case we submit should follow the Seventh Circuit's decision last year in 13-investment. The Seventh Circuit, dealing with a joint check case, a non-alternative A and B check, relied on UCC section 3414C. If a draft is accepted, regardless of when or by whom acceptance was obtained. Now, the light really went on here with VFS's Rule 28J letter, because they pointed out that the prior statute, the prior version of the UCC, which was 3802, was an analog statute and that was at issue in Concepcion. Can I ask you a question, though? I mean, we're bound here. We're at least supposed to apply floral law, correct? Yes. Okay, and there is a Florida statute that's applicable? That's correct. I'd like you, at some point, to focus on the Florida law and the statute. The Florida law is the same as the law at issue in the 13-investment. That is, Florida statute section 673.4413 is UCC section 3414C. I'm just calling it by the UCC number so it's easy to compare. The Rule 28J letter really turned the light on, because it said, well, the prior analog statute, which the letter incorporated, it includes the text. That text does not have the key language, which was, regardless of when or by whom acceptance was obtained. In fact, if you look at the comment to the new statute, to the Florida statute, and Florida, unlike many other states, has adopted the comments to UCC. The comment to that provision, comment 3, says, this changes former section 3-4111, which provided that the drawer is discharged only if the holder obtains acceptance. Now it's regardless of who obtains it. So you don't have to go into the question of whether someone was a holder, that is, whether they had the signatures of both co-payees. Because it doesn't matter whether it's the holder anymore. Under the revised section, it's regardless of who obtains it. That is, the bank is on the hook. And so you wonder, well, how did all these other cases that plaintiff VFS cites come out differently? And it all goes back to the General Motors Acceptance Court, the GMAC case from 1993 from the Massachusetts Supreme Judicial Court. That case was relying on Article 3, Section 802, the analog statute that VFS submits with its Rule 28J. It wasn't relying on 3-411C, 414C, the current Florida statute, because Massachusetts didn't have it at the time. So that's why it cites the old statute. And so it comes out differently, because it simply doesn't have the language, regardless of whether by whom acceptance was obtained. The later cases run on the fumes of GMAC. They say, well, we really agree with the logic of GMAC, without recognizing, apparently, that the UCC issue had changed to what Florida has now. So now you have discharge of the drawer, regardless of whether by whom acceptance was obtained, with the comment to that section in the UCC. And so they're citing, they never cite, except for the North Dakota case, 3-414C, they cite GMAC and the California case in Christoplex, but no one citing the key provision of the current form of the code. That was a mistake for those later courts, which had the current version of the statute. But then you get to the Seventh Circuit. The Florida analog is section 673.41413, right? Yes, exactly. But it's the same language. No, I'm just looking for the, I was just making sure I had the number. I believe that's correct. Is the Florida statute correct? It is. It is. I may have misspoken earlier, because I wrote it down incorrectly. But the key point is that the Florida statute is now what the Seventh Circuit had before it. But GMAC did not have it. And the later cases cited GMAC without going back and looking at the statute before them, much less the comments to the code. When was that, was 414, 673-41413, when was that enacted? At the same time as the other UCC provisions in that chapter, or did it come later? No, it's cited in our response to the 28J letter. I believe it's adopted in 1993. Okay. So, Florida has it. Presumably a lot of other states have it, too, because they're citing new versions of the code. But no one's going back and looking at that provision. I think it's 1992. I'm sorry? I think it's 1992, but I could be wrong. I think the statute's passed in 1992, and the new version went into effect on January 1st of 1993. So, the subsequent cases simply were running on the few. And why is this significant? It's particularly significant in Florida because the new version, adopted in 1992, effective in 1993, is consistent with the Florida Supreme Court's recognition, going back to 1960 in Miami Beach First National Bank versus Edgerly, that a bank that accepts a check is solely responsible if it fails to ensure proper endorsement because it has ample opportunity to check the endorsements, quote, whereas the maker of the check has no such opportunity. The UCC has now caught up with Florida Supreme Court in Edgerly and recognized that when the bank messes up and accepts a check without proper endorsements, it's on the hook for that check, not the drawer, which had no control. And again, the district court found here that Markel American had no control. It sent out the check as it should have, and it had no ability to determine what the insured would do with it when it received it. It was made out properly. And that's what the comments, which are adopted by Florida, that's what they say? Yes, that's what it says. The comment to that provision says it no longer has to be a holder. This changes former section 3411, subsection 1, which provided that the drawer is discharged only if the holder obtains acceptance. Right. It's now no longer the holder. It's now regardless of who obtained acceptance. It's no longer limited because it's now squarely on the bank to get this right. And why is a bank different? Well, it's in the business of holding and safeguarding everyone's money. It has centuries of experience and expertise in checking endorsements before accepting checks. And most critically, the doctrine of last clear chance underlies a lot of the UCC provisions. The bank is the one that can prevent the loss by doing its job. The maker of the draft has no ability to change it. It sends out the check. All it can do is address it properly, and the bank messed up. It's funny because GMAC said, the Massachusetts court said, that ideally GMAC should have sought payment from the bank, and that the loss must have ultimately formed there. But it said, look, we have no way to control this because it looks like if we don't put the burden on the drawer to pay a second time, the people won't get paid. Well, that's not what happens here. The drawer under the current version of the UCC that Florida has is discharged. But the check's still out there. It's just the bank that has to. The instrument is not discharged. It's just the bank has to pay on that check. What provision of the UCC provides the most direct route of liability for the bank that cashes the check? Your Honor, I think I'm blanking on it right now, but it's in there. And the Seventh Circuit, I think, cites the current UCC provisions and what imposes liability on the bank. Under what sort of UCC theory, a conversion theory? Well, yeah, they would say, right, it would be a conversion theory. The problem is now we can't sue, Markell can't sue the accepting bank. We would have to sue SunTrust, which would then have to sue the bank. And I'm sorry I don't have in mind the statute that makes the bank liable. But it was a choice. I think it's pretty well accepted, and we are happy to provide a letter with a citation to the UCC provision on that. We'll find it, thank you. Okay. That's the problem with securities litigation, that if you don't recognize that the bank's liable and take the drawer off, then they sue the drawer. The drawer sues its bank, which then has to sue the accepting bank to get it to the bank that's responsible for it in the first place. And so the current UCC says we're leaving the drawer out of this entirely. They did nothing. We're going straight to the banks, which should never have paid the check, and they can make good on it. And the bank is easily available to find a JPMorgan Chase branch that you can sue. And which bank is liable? The one that negotiated the wrongfully endorsed check in the first instance or the depository bank that holds the drawee's account? Ultimately, both are, but I believe the law suggests that the depository bank has a claim against the bank that negotiated the check in the first place. It's their responsibility. But the one thing that's clear is it's not the drawer of the check who is completely out of this, has no ability to control this. The other point that I think the Seventh Circuit makes clear in 13 investment is that it doesn't matter whether you're an agent or not, whether it's co-payees or agent, because the UCC doesn't turn on this. And I think it's important to note that when you're in the position of the person making out the check, you're in the dark as to what exactly the relationship is between the co-payees. You don't know whether there's an agency agreement for a special agency agreement for acceptance of payment. All you know is you make out your check, you mail it out, here, pursuant to our policy, we paid our insured. And that ends our liability. And the liability then shifts to the co-payee and to the banks. And they're the ones who should be here, not us. All right. Thank you very much. You've saved your time for rebuttal, Mr. Cooper. Ms. Pohl. May it please the Court, Beverly Pohl from Nelson Mullins for the Appellate VFS. Nothing that we just heard was raised and argued by Markel in the District Court. It wasn't in their affirmative defenses. It wasn't in their motion for summary judgment. It wasn't in their response to our motion for summary judgment. The statute that forms the central and sole issue on appeal was never in any of their pleadings or legal memoranda. I have never seen such a stunning disconnect between what was argued in the lower court and what was argued in the Court of Appeals. And I think that that's sort of an implicit admission, if you look at their reply brief, because they spend 10 pages in the reply brief talking about exceptions to the failure to preserve. But here's the potential problem with that waiver or forfeiture argument. We are addressing and interpreting a state statutory scheme basically under the UCC, the Florida version of the UCC. And in order to make sense of that scheme, we've got to read all of the provisions that we think are relevant to that scheme. If the parties in the District Court had completely missed a statutory provision that was directly on point, we wouldn't be barred from looking at it and saying, you know, you guys missed it. We think you missed it. We're going to use it. We're going to rely on it. We think it's important. What am I missing? I think it's important and you can rely on it to affirm. You can rely on anything you want to affirm. But it is the appellant's burden to have raised the issue that they're arguing on appeal before. What do we say in the appeal? If we rule for you on explaining that they've given up any reliance on or forfeited any reliance on 673.41413 by not raising it below, we drop a footnote to say, by the way, our decision may be completely different in a case where someone raises 673.41413. That is really the case in every situation where an appellant fails to properly preserve an argument for appeal. I don't want to belabor that because if you don't think it's forfeited, then I won't spend more time on it. I don't want to say that I don't think it's forfeited. I'm asking a question about how that forfeiture theory works in a scenario where we're interpreting a statutory scheme and someone doesn't rely on a relevant statutory provision. I think maybe if his issue on appeal was more broadly stated or if the brief was different than it is, but it is all about this one statutory provision. He says in the brief, the district court failed to consider this statute. Well, the district court was never presented with this statute. I think to move to the merits a bit, if this statute was dispositive, as Markle seems to think it is, then there would be at least one case out there that found on these similar facts that that statute was dispositive. There is not a single case cited because every case that kind of goes Markle's way is distinguishable by being a case involving an agent. If you read the statute, his statute, the way they want you to read it, it completely undermines any distinction between alternative co-payees and non-alternative co-payees. Not in the sense of who can negotiate. It's the sense of who's liable. The district court seems to have conflated the question of who can negotiate with who's liable for an improper endorsement. Those are different questions. More than one party may be liable. I don't dispute that somebody, whether it's us or Markle, has cause of action against the bank, but it's not the only available cause of action. But you've got a cause of action against the party that received the money, the trucker. Your client made that party its agent for purposes of obtaining insurance. There was a contractual relationship between the two. Your client owns a bunch of trucks. You lease them to a truck company, and you say you get coverage for the trucks, and that's part of the bargain. So they probably paid less rent because they're paying for the insurance. So that's the agent. So the agent makes a claim, and now the insurance company sees there's a loss payee and sends a check to both. So I'm concerned about, I don't know of any cases like that. There are plenty of cases where an agent's cashed the check and courts have found that that's fine. But there's no discussion in this record about the lessee being our agent, particularly for the receipt of payment. Well, the agent for purposes of insurance. But not for receiving. There's no evidence in the record. No, no, I understand, but the agent made the arrangement with Markle. But we have an underlying agreement with Markle as the insurer that they will pay us. Where did that come from? Because we are the loss payee. Oh, I know that. You're a third-party beneficiary. Yes. And Florida law says. You're a third-party beneficiary, and the party that made the contract injured your client, basically. Florida law says that the third party, I mean, the loss payee can sue under the underlying obligation under the contract, and that's what we're doing. The question to me becomes whether there's a statute or something that upsets this delegation of authority to the lessee. I don't agree that we delegated any authority to the lessee. Oh, it was part of the bargain. There's a lease of trucks, and there's a payment that the lessee is making, right? Yes. And that payment includes the insurance, so the rent is less. If you bought the insurance, the rent's more. So you said buy the insurance, and you handle the matter. And they handled the matter. But as the loss payee, we were entitled to. Oh, I understand that. You're a third-party beneficiary. And a non-alternative payee. And if you read this statute the way Markle wants you to read it, we do away with any difference. I know it's not an alternative payee. No, but it doesn't eliminate the requirement that every alternative payee have to endorse. It just changes who's liable for a check that's negotiated with an improper endorsement. Those are two different things. The propriety of an endorsement, the impropriety of an endorsement, doesn't necessarily tell you who's liable at the end for that improper negotiation on that endorsement. What sense does it make to hold the insurer liable under these circumstances when it has no fault? The insurer has an underlying obligation to pay us. And let's talk about what – But they have an obligation to the tracking company because they're the insurer. And to us. So they – That's where the policy is. If they didn't think they had an obligation to pay us, we wouldn't have been one of the payees on the check. But they did – They had an obligation to pay us. But they did issue the check in both names, right? They did. But nobody told us that. So what fault did the insurer have in this case? The fault is that we did not get paid. You didn't get the check first is really what your complaint is. It's really not about fault. I think it's about the obligation to pay. And is there a circuitous route? What were they supposed to do, counsel? What were they supposed to do? Once they issued the check, they issued the check to A and B, correct? After they issued the check and it was sent out, what more were they supposed to do? How hard would it have been to CC VFS on the correspondence so that they knew there had been a claim and they knew had been – Is there a statutory requirement that they do that? No, there's not. But you know what? There's a common sense business – Your argument would – And if the question is what more could they do, they could include the lost payee in some notification about what's going on. This is not a negligence theory, and your argument would be the same in that hypothetical as it is today, that they're still on the hook. Because if somebody at VFS had not read the email and somebody at the trucking company had negotiated by itself and then got into bankruptcy like it did, you'd still be going after Markle. You talk about this. So they're without fault. Well, certainly VFS is without fault. You've got two innocent parties here. Read. And they have an underlying obligation. It makes sense that we should be able to seek remedy from them. And if they want to seek a remedy from someone else, they can do that. You could have had the policy issued to your client as the insured. The insured. No, my client – And also cover the lessee's operation. He's saying as a business matter, VFS chose not to insure the vehicles but to require the lessee's to insure the vehicles and include it as a co-insured. And that's what's led to this whole mess. Sometimes on some of the documents it says co-insured. Some of them say lost payee. But the district court didn't think that that made any difference. And I would refer the court to the analysis in the McAllen case because I understand GMAC was decided under the prior version of the UCC, but the Texas Supreme Court case in McAllen did a thorough analysis under the current UCC, and they found that it makes more logical sense to refer to what in Florida is Section 1101, Subsection 4. It says the check cannot be discharged except by signatures from both of them. And I know that perhaps you're looking at the language of 4141 and just reading it on its face, but this morning I heard the court say that relying on textual purity is not the end-all be-all that people make it out to be. And sometimes you have to look – Maybe I'm in a minority in thinking that. I was thinking the same thing. Don't take it too far. But I think that that's true in this case because this is a general statute, and many courts, including the North Dakota court, which wrote an extensive opinion on this, said there is a more specific statute that should apply here, and that applies when you've got non-alternative co-payees. You're making an argument that this regards altogether the contract between the lessor and the lessee. That's irrelevant. Well, that's what – It's just plain irrelevant. The fact that you're a lost payee ends the question. The insurance company's got to find you out. I don't think that merely by having a lessor-lessee contract that that makes one the agent – Well, it makes the lessee the agent for insurance purposes. Well, that certainly has never been argued in this case. Well, whether it's argued or not, that's the facts. Have any of the cases that – There are a number of cases that support your position and the position that this court took. Do any of those cases analyze the UCC analog to 673.41413? Not in any depth, no. Sometimes there's a citation, but they focus on this 1104, or the analog to 1104. That's what McAllen really wrote. Yes, yes. And Christoplex, I mean, there's a whole bunch of them. And it's interesting because they were all cited on one page of our motion for summary judgment, page nine. It's in the supplemental appendix. And in the response that Markle filed, it doesn't even comment on those cases. I mean, I just find that this whole argument, this UCC argument, is not preserved. It's just not. It's never been argued in any form in the district court by Markle. And if access now and all of the principles of preservation have any meaning, it's not preserved. And this court has a choice. It can say, I'm sorry, we're not reaching that issue. But we also have a case, Home Depot, that says, but there's a difference between raising new issues and making new arguments and appeal. And where an issue is properly presented, a party can make any argument in support of that issue. Parties are not limited to the precise arguments they made below. And Markle has consistently argued below that its obligation was discharged when the bank accepted the joint check. I mean, that's been their argument below all the time. I agree with you. They argued that by delivering the check, that discharged their argument. Now they're arguing that by the bank accepting the check, that discharged their liability. Those are two diametrically opposed arguments. I think it's the same coin. It's just a flip side of the same coin. Because at the end of the day, once they wrote the check, it had to get sent somewhere, and the bank decided to deposit it and cash it. I mean... Well, I would just wrap up by saying, since this Concepcion case, I realize it's old, and I was a little uncomfortable submitting a 1992 case as supplemental authority, but everybody thought there was no Florida case on this subject. And to the extent that we're looking at the UCC overall, this case could not be more perfect. And yes, I know that there's a new provision of the UCC, but since 1992, which is, what, 30 years, not once has this 4141 been used categorically to relieve somebody from liability in these situations. Not in Florida, and not anywhere. So I think this court should affirm. Thank you very much, Ms. Cole. I have three quick points. First, as to the precedent, the Seventh Circuit had an agency case, but it says at the end of its discussion, neither the underlying cases we cite nor the text of what is in Florida 4141 turn on whether or not there's an agency relationship. And the court said, more to the point. UCC doesn't turn on that. That case was unavailable to you at the district court and when you filed your initial brief, but the statute was not available to you? Right. You're right, Your Honor. But the issue in this case has been what's the liability of the party under the UCC? That's not my question. You didn't cite it. And Ms. Cole says that that should weigh heavily against you, if not bar you from relying on it on appeal. Your Honor, there are... This court has, since Dean Whitter Reynolds, has five circumstances under which you could raise even a new argument. We don't think this is a new issue. This isn't a new issue. The issue is what's our liability under Florida's version of the UCC? A new theory for the same issue. It's a new theory or it's a new argument for the same issue, which is what's our liability under Article 3 of the UCC? It's not like the Balboa case where someone said, oh, Florida law's not helping me on appeal, I'm going to bring in Connecticut. We also want to discourage... I speak only for myself and not my colleagues. We want to discourage litigants and their counsel, and I'm not saying you did this, but from, in essence, sandbagging district judges who are given a set of circumstances, a set of legal arguments. They're very busy, they rule on those legal arguments, and then when you come on up on appeal, it's like, whoa, here's a new one for you, here's a new wrinkle for you, and the district court judge was never presented with it. Well, in a sense, Your Honor, as we pointed out, several of the cases that the district court cited going our way discuss this statute, and the VFS's response brief said, well, you can presume that the court was aware of this. No, maybe you could presume. Maybe you could presume that it was, but this is, I think, an archetypal case for where... Trust me, we were not trying to sandbag, but this is an archetypal case where the people of Florida need for this court to get the UCC right. This is a generally applicable question. We raised the UCC, we missed this one provision, but it's there, and then the Seventh Circuit highlighted it, and they had a chance to address it. And did you raise the comparative UCC provision below? No, Your Honor, because we were dealing with what the current UCC provided. I think what really kind of highlighted that was when VFS submitted the old form of the statute, and then it became clear why we got this disconnect between the Seventh Circuit, which cites 4141, the equivalent, and the prior cases, which didn't. And understand, McAllen didn't cite the equivalent of 4141. They never get there at all. They cite other provisions, and they follow GMAC, and they never deal with what's the relevant provision. And you get to that when you get to the Seventh Circuit, which gets the issue right, and then says agency doesn't matter because this provision doesn't deal with agency. Again, co-payees that are wrong have a remedy. It's just not against the innocent party that did its job, sent out a joint check, and had no ability to stop the co-payee insured who got the check from esconding with the funds. All right, Mr. Cooper, Mr. Pohl, thank you both very much. Thank you. That concludes the day. We're in recess. All rise.